UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA,

                                                                                 Case No. 14-cr-105 (MKB)

       -   v.   -

JORGE ESTRADA-TEPAL,

                Defendant.

--------------------------------------------------------------x

**MEMORANDUM IN AID OF SENTENCING**

                                                     PERLMUTTER & McGUINNESS, P.C.
                                                     260 Madison Avenue, Suite 1800
                                                     New York, New York 10016
                                                     Tel: (212) 679-1990
                                                     Fax: (888) 679-0585
                                                     Counsel for Defendant Jorge Estrada-Tepal

**Table of Contents**

Introduction ...................................................................................................................................1

Factual Background .......................................................................................................................1

    A.   Case History ............................................................................................................1

    B.   Childhood & Family Background............................................................................3

    C.   Context of the Offense Conduct ..............................................................................5

    D.   Jorge's Health Status ...............................................................................................7

    E.   Prior Criminal History .............................................................................................8

    F.   Financial Ability.......................................................................................................8

Legal Authority of the Guidelines and the 3553(a) Factors ..........................................................8

Jorge Should Receive the Mandatory-Minimum Sentence of 15 Years .....................................10

    A.   Pretrial Confinement..............................................................................................11

    B.   Post Arrest Conduct ...............................................................................................12

    C.   Family Circumstances............................................................................................12

    D.   Other Considerations .............................................................................................13

Conclusion....................................................................................................................................14

**Introduction**

This case represents the very worst outcomes of misguided conceptions of the American Dream. Jorge Estrada-Tepal believed that he could come to the United States with his wife, a prostitute, and seek a better life than the grinding poverty in which they has always lived in Mexico. But as with many dreams, this one proved illusory and ultimately resulted in a tragic outcome for them and others.

Jorge crossed many lines to bring him to sentencing by the Court – illegally entering the United States, forcing his wife to continue working as a prostitute in the U.S., and working with his brothers to bring their wives and other women illegally into the U.S. to engage in the same activity. All of these lines were crossed because of economic desperation and the dream that a better life could be achieved by passing through a dark time in America. Jorge has and will pay a heavy price for his actions, even with the mandatory-minimum punishment available to him – fifteen years of incarceration. But based upon his background, and the circumstances of this case, a fifteen-year term of incarceration is sufficient but not greater than necessary to meet the ends of justice. He prays to receive that sentence by the Court.

**Factual Background**

A.   **Case History**

Homeland Security Investigation agents arrested Jorge on January 14, 2014. He was living at a residence at 612 South 9th Avenue in Mount Vernon, New York. That location had been damaged by fire, and Jorge was on repairing and remodeling the home for its owner. Jorge truthfully identified himself to the agents and admitted that he was illegally present in the United

States. He also consented to a search of his bedroom where the agents found handout cards promoting prostitution.

 Jorge agreed to speak with the agents. He told that them that and he and his wife, Jane Doe #1 entered the U.S. illegally after cross the U.S./Mexico border. He paid the coyotes a smuggling fee of approximately $2,000 per person. After traveling to New York, they resided at an apartment in the Corona section of Queens, south of LaGuardia airport. Jorge told them he worked in the construction business, and that his wife eventually left him for another man. He also confirmed the identities of his brothers: Victor, Ricardo and Juan. Jorge also told the agents that Juan's wife, ███████████████, another victim (Jane Doe #5), lived in the United States. He further admitted to two prior attempts to illegally enter the United States, and said that he had been arrested during one of these times.

 Jorge did not realize at the time of his questioning that he was the subject of an ongoing investigation involving his brothers, wife and others. The statements made to the agents were truthful, although not a complete description of his activities. Jorge ultimately pled guilty to Counts 1 and 2 of a 14-count second Superseding Indictment. Count 1 charged that "between 2007 and January 2014, Jorge and his brothers, Ricardo and Victor Estrada-Tepal, together with others, conspired to engage in sex trafficking" in violation of 18 U.S.C. §§ 1594(c) and 1591(a)(l) and (2). Count 2 charged that between 2007 and 2011, Jorge, his brothers, and others, engaged in sex trafficking, specifically of Jane Doe #1, in violation of 18 U.S.C. §§ 1591 (a)(1), (2); and (b)(1). Jorge is not named in counts 3, 4, 5, 9, and 14, and the balance of the counts remain open. Jane Doe #1 is Jorge's former wife.

**B.     Childhood & Family Background**

Jorge is the product of the grinding poverty of rural Mexico, an alcoholic father, and a mother who struggled unsuccessfully to provide for her eight children. Jorge was born on February 25, 1977, in Guerrero region of Mexico on the southwest Pacific coast. Guerrero is most known as the location of Acapulco, but it is a poor area with low rates of literacy. His mother, Guadalupe Tepal-Sanchez passed away in September 2012, at the age of 66, from complications related to diabetes. Jorge had a close relationship with his mother. She was his primary caretaker who sold tortillas, washed clothing and "did what she could" to earn money to send her eight children to school.

Jorge's father Roberto Estrada-Hernandez is 71 years old, and lives in Guadalajara, Mexico, with several of Jorge's uncles. He is a severe alcoholic and suffers from cirrhosis of the liver from long-term alcohol abuse. Roberto was a construction worker but rarely worked because of his inability to maintain sobriety. Rampant alcoholism made him unable to provide for the family. Jorge's father has always been an alcoholic. As far back as Jorge can remember, his father verbally abused Jorge's mother when drunk. Growing up, and as an adult, Jorge and his siblings tried in vain to help their father achieve sobriety, including sending him for treatment. Despite his children's efforts, Roberto continually relapsed, and a decade ago was diagnosed with cirrhosis.

Jorge's parents had a total of eight children, including Victor and Ricardo, who are co-defendants in this case. The remaining six siblings all live in Mexico: Adrian (age 53), Camilla (age 50), Maria (age 48), Juan Carlos (age 44), and Muaro (age 42). Jorge is not close with his sisters and two older brothers, all of who eventually left home and failed to maintain contact with

their mother. The siblings with whom he is in contact are in good health. He has had little to no contact, however, with his sisters and two older brothers, and does not know their status.

Jorge was married to ▓▓▓▓▓▓▓▓▓▓ (age 36) in Guerrero, Mexico, on March 5, 2005. They had no children together. Ms. ▓▓▓ has been identified as Jane Doe #1 in the case. She worked in Mexico as a prostitute – a large-scale and decriminalized profession in that country – and moved to the United States with Jorge intending to make money by continuing in that line of work. *See e.g.,* http://prostitution.procon.org/view.resource.php?resourceID= 000772#mexico (last checked September 2, 2015). Ms. ▓▓▓ eventually left Jorge when he returned from Mexico at the end of September 2011. At that time, Jorge learned that Ms. ▓▓▓ was pregnant from her relationship with another man. She is now married to that individual, and lives in Brooklyn with that man and her child from their union. Jorge has not spoken with Ms. ▓▓▓ since November 2011.

Jorge also has a son in Mexico, L. E. (age 14), with Abigail Rojas (age 34). Jorge's relationship with Ms. Rojas ended in 2003 due to Jorge's alcohol abuse. *See infra.* Jorge tried to save the relationship but Ms. Rojas wanted to leave him, including not wanting to have any contact with Jorge or support for their child. Ms. Rojas moved with their son to Puebla, Mexico, and Jorge has had no contact with Ms. Rojas since that time. Jorge had visited with his son every few months prior to coming to the United States in 2007. He also visited L.E. two times when he returned to Mexico in 2011. Jorge sent L.E. approximately $400 per month through his maternal grandmother. He has maintained a relationship with L.E. since the time of his arrest and speaks with him on the telephone. L.E. is healthy and works as a construction assistant.

Jorge has another son, J.M.E. (age 3), with Rosalva Coxca (age 25). He and Ms. Coxca started their relationship in the United States in January 2012. She returned to Mexico, however, in April 2012 when she became pregnant because she wanted her child born there. Jorge sent her between $100-150 per week for support up until the time of his arrest in January 2014. The circumstances of Jorge's arrest have greatly strained his relationship with Ms. Coxca. Their relationship remains intact though, and Jorge plans to reside with her in Mexico when he is eventually released from federal custody and deported from the United States. ICE has lodged a detainer to remove him from the U.S. at the end of his term of incarceration.

Jorge has never met his son with Ms. Coxca. He believes that the child is in good health. Jorge has encouraged Ms. Coxca to seek a relationship with another partner who "loved and respected" her since he will be incarcerated for at least 15 years. Ms. Coxca has told Jorge that she wants to wait for him. Jorge's separation from the son whom he has never met bears most heavily on him through this entire experience. He has stated that his only wish at this point is that he "just wants to the chance to meet [his son]" when he is released.

Due to the circumstances of this case, including that two of Jorge's brothers are co-defendants, the nature of the charges to which Jorge pled guilty, and the long-distance and rural location of the family members with whom he maintains contact, Jorge has no support letters or other material, either from family or others, on his behalf.

## C.   Context of the Offense Conduct

As noted, Jorge grew up in rural poverty. He describes his childhood home as a two-room "shack" with a kitchen and single bedroom that had no hot water, plumbing or electricity. His mother struggled to feed him and his seven siblings, and to provide them with an education. His education only went to the sixth grade because his mother could not afford the expense of

5

sending him further. To this day, Jorge speaks only Spanish and has very limited ability to read and write.

Jorge started working in construction at age, and left home at 16 to do construction in Guadalajara work with a paternal uncle. As a child and teenager, Jorge would work and sleep at the construction sites because he had no money to pay for a room. Life in Mexico was always hard for Jorge and he saw no way out of poverty if he remained there. In 2007, he illegally entered the United States crossing the Arizona boarder with ▮▮▮▮, who worked in Mexico as a prostitute, which is a decriminalized profession in that country. Jorge returned to Mexico two times since crossing the border in 2007. He returned in 2008 and 2011, each time for approximately six months to do work constructing a home in Teziutlan, Mexico.

Jorge planned to work construction in America while ▮▮▮▮ worked as a prostitute so they could earn money and eventually return to Mexico. Jorge said that he come to the United States because he "was tired of being poor my whole life" and wanted to buy a home and have a family. Jorge has always worked in the construction field, and was noted for his diligent work ethic, except for when he abused alcohol at the end of his first marriage. He continued to work construction after coming to the United States from September 2007 through January 2014 (other than the times he returned to Mexico in 2008 and 2011). He would earn between $700 and $900 per week and send money back home to support his two sons and pay for his home there. Jorge worked for several construction companies through New York City.

Jorge and ▮▮▮▮ lived in the Corona section of Queens when they came to the United States. Jorge eventually moved to Mount Vernon in the summer of 2013, where he lived alone until his arrest in January 2014. The marriage did not survive the plan to make a better life in America because Jorge forced ▮▮▮▮ to continue working as a prostitute when she wanted to

6

stop. Jorge and ▆▆▆▆ had incurred large debts to be smuggled into the United States, and living here placed additional financial pressures on them. Between this situation, compounded with similar activities by his bothers, ▆▆▆▆ left Jorge to have a child with another man, and the entire enterprise eventually collapsed leading to the arrest of Jorge and his brothers in this case.

**D.      Jorge's Health Status**

Jorge was diagnosed in 2005 with leukoderma, a dermatologic condition resulting in localized loss of pigmentation. It is a cosmetic problem that is neither infectious nor contagious. The condition causes Jorge no pain or discomfort beyond the effect on his physical appearance, including parts of his face. Otherwise, he has no serious or chronic illnesses, nor any history of mental or emotional problems.

Jorge does have problem with substance abuse. He started using cocaine in Spring 2013, and used in an individual, non-social setting approximately two times per week. Jorge believes that he would have continued to abuse cocaine had he not been arrested. While he reports that he would not continue using upon his release, his belief is largely an assessment anticipating his lengthy mandatory-minimum sentence.

Like his father, Jorge also has a problem with alcohol starting at age eighteen. He reports that he is a "binge" drinker, consuming 20 beers at a time on a monthly basis. Jorge's abuse of alcohol caused the end of his first marriage as well as loss of employment in Mexico. He would benefit from alcohol treatment during his incarceration, although he is not eligible for BOP residential drug treatment program because Jorge is subject to deportation after serving his sentence.

The BOP's internal inmate monitoring database, SENTRY, reports that Jorge has not

7

participated in any course or programs. He is at the MDC, which does not offer those services to detainees beyond a GED program, which is of sporadic availability to inmates, and with even less availability to non-English speakers. The SENTRY system also shows that Jorge has been a model prisoner with no any disciplinary problems or sanctions.

E.     **Prior Criminal History**

Jorge has no prior criminal record either in the United States or Mexico, although he reports being arrested during two entry attempts into the United States. He has a criminal history score of zero and a Criminal History Category of I. The only other criminal conduct attributable to him in the United States is possession of a forged United States permanent resident card. He has been charged with this offense in Count Thirteen of the Second Superseding Indictment and the charge remains open.

F.     **Financial Ability**

Jorge has no ability to pay any fines or restitution in this case. His only reported asset is his home in Mexico worth approximately $25,000. He has loans related to medical treatment in the amount of $8,000, leaving him with a net worth of $17,000. The PSR at ¶ 89 finds Jorge unable to pay a fine.

## Legal Authority of the Guidelines and the 3553(a) Factors

The Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States,* 552 U.S. 85, 90 (2007); *see also Gall v. United States,* 552 U.S. 38, 59 (2007). "The statute, as modified by *Booker,* contains an overarching provision instructing district courts to 'impose a sentence

8

sufficient, but not greater than necessary,' to achieve the goals of sentencing." *Kimbrough,* 552 U.S. at 101 (citing 18 U.S.C. § 3553[a]); *United States v. Booker,* 543 U.S. 220 (2005). Because the "Guidelines are not the only consideration," the Court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate…should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall, supra* at 49-50.

The judge must independently evaluate the appropriate sentence in light of the § 3553(a) purposes and factors, and must consider arguments that the guidelines should not apply on general policy grounds, case-specific grounds (including guideline-sanctioned departures), or "regardless." *Rita v. United States,* 551 U.S. 338, 347-351 (2007). In pertinent part, 18 U.S.C. § 3553(a) provides,

> The court shall impose a sentence sufficient, but not greater than necessary.... The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>     (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>     (B)  to afford adequate deterrence to criminal conduct;
>
>     (C)  to protect the public from further crimes of the defendant; and
>
>     (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—

9

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

At sentencing the judge "may not presume that the Guidelines range is reasonable." *Gall,* 552 U.S. at 50; *see also Rita, supra* at 351. If the Court decides that a sentence outside of the Guidelines is warranted, then the Court "must consider the deviation and ensure that the justification is sufficiently compelling to support the degree of variance," *Gall,* 552 U.S. at 50. "Extraordinary circumstances" are not required to justify a sentence outside of the Guidelines range, *Id.* at 47.

Of great importance is the fact that district court judges must now consider and respond to nonfrivolous arguments that the guideline sentence itself reflects an unsound judgment because it fails to properly reflect § 3553(a) considerations, does not treat defendant characteristics in the proper way, or a different sentence is appropriate regardless, *Rita,* 551 U.S. at 357. District courts are no longer required, or permitted, to simply defer to Commission policies, *Id.* Appellate courts may not "grant greater fact finding leeway to [the Commission] than to [the] district judge," *Id.* at 347. Even the government has "acknowledge[d] that . . . 'courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines,'" *Kimbrough,* 552 U.S. at 101.

### Jorge Should Receive the Mandatory-Minimum Sentence of 15 Years

Jorge is not a fundamentally bad person despite his offense conduct. He is the product of poverty, little education, an alcoholic father, and his own substance abuse issues, including cocaine use and a penchant for binge-drinking alcohol. He takes full responsibility for his conduct. He pleaded guilty, and cooperated with law enforcement when they arrested him by

consenting to a search of his residence and answering questions. Jorge has also been a model prisoner while incarcerated at the MDC with no disciplinary issues whatsoever. In addition, he has been subject to harsh confinement at the MDC for over eighteen months, including a lack of programming or education opportunities.

### A. Pretrial Confinement

In determining his sentence, the Court should also take into account the length of Jorge's pretrial confinement in the MDC. While Jorge asks for a variance on this basis, the Second Circuit has upheld departures based upon harsh conditions of confinement. *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (*per curiam*) ("[P]re-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures."); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996) (noting downward departure of three levels based upon harsh confinement in State facility). Moreover, the MDC has even fewer educational and social development programs than the MCC. At the same time, the MDC is "a pre-trial detainee institution that is not designed for long-term stays." *See United States v. Behr*, 2006 U.S. Dist. LEXIS 38349, at *13 (S.D.N.Y. June 8, 2006).

11

**B.     Post Arrest Conduct**

Rehabilitation between arrest and sentence can also warrant the imposition of a minimum sentence. *See e.g. United States v. Maier*, 979 F.2d 944 (2d Cir. 1992) (successful drug rehabilitation between conviction and sentence is a basis for a minimum sentence); *United States v. Workman*, 80 F.3d 688 (2d Cir. 1996) (abandonment of criminal lifestyle for reformed lifestyle—between time of arrest and sentence—is a basis for minimum sentence); *United States v. Core*, 125 F.3d 74 (2d Cir. 1997) (minimum sentence permitted based upon rehabilitation efforts).

In the present case, Jorge has shown deep, profound remorse for what has happened. Visits with him frequently end in tears as he recounts how terrible he feels for everything that has transpired. Jorge has had no disciplinary incidents during his over eighteen months at the MDC. He has not even had so much as a disciplinary summons issued at the facility. Jorge's conduct reflects how he intends to live out his time in BOP custody. He has never been involved in any gang or similar activity. Rather, he seeks only to be transferred to a facility where he can obtain educational and program opportunities to serve his time quietly, productively and without incident.

**C.     Family Circumstances**

Jorge should also be entitled to some consideration for a minimum sentence because of his family circumstances. In some circumstances, extraordinary family responsibilities can serve as a basis for a minimum sentence. *See e.g. United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991); and *United States v. Handy*, 752 F. Supp. 561 (E.D.N.Y. 1990). The rationale underlying an "extraordinary family circumstances" minimum sentence can be applied to the case at bar.

Jorge has a young son who he has never met. That boy lives in rural Mexico with his mother, but they are without the financial support that Jorge provided prior to his arrest. Jorge wants to be able to return him, meet his son for the first time, and help provide for him to build whatever possible relationship they may be able to develop fifteen years hence. In the hope that he can fulfill that dream, he begs the Court to sentence him to the mandatory-minimum period to allow that to happen before his son reaches full adulthood.

**D.      Other Considerations**

Jorge also prays that the Court will consider the context of his offense conduct. Prostitution is a rampant, legal industry in Mexico. ████████, as well as many of the other women involved in this case, worked as prostitutes before their arrival in the United States. To the extent that this was not the case, the parties involved were not completely naïve to the circumstances and conditions under which they agreed to live. There is no question that lines got crossed when women decided that they no longer wanted to take part in the activity. Jorge has admitted to this fact in his dealings with ████████. Moreover, while the Court would never condone the activities under which sex workers may be non-consenting in their conduct, it should be cognizant of the full context that gives rise to the activity.

Jorge bears deep shame for seeking such a completely misguided route to his conception of the American Dream. He carries that guilt for his dealings with ████████, as well as his involvement in his brothers' actions. That remorse is real and he begs for mercy from the Court by imposing a fifteen-year (180 month) sentence.

13

**Conclusion**

For all the foregoing reasons, Jorge Estrada-Tepal requests that the Court impose a sentence of a fifteen-year (180 months).

Dated:   New York, New York
         September 4, 2015

                         PERLMUTTER & McGUINNESS, P.C.

                         By: _/s/ Adam D. Perlmutter_____
                              Adam D. Perlmutter

                         260 Madison Avenue, Suite 1800
                         New York, NY 10016
                         Tel. (212) 679-1990
                         Fax (888) 679-0585
                         adp@pmlawnyc.com
                         Counsel for Defendant Jorge Estrada-Tepal