

U.S. Department of Justice

United States Attorney
Eastern District of New York

TM
F.#2013R01154

271 Cadman Plaza East
Brooklyn, New York 11201

September 14, 2015

By ECF

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Estrada-Tepal, et al., 14-CR-105 (MKB)

Dear Judge Brodie:

      The government respectfully submits this letter in advance of sentencing in this case, which is scheduled for September 17, 2015, at 10:00 a.m. On that date, the Court is scheduled to sentence defendants Jorge Estrada-Tepal, Ricardo Estrada-Tepal and Victor Estrada-Tepal.

I.      Factual Background

      As detailed in the PSRs, the defendants in this case participated in a sex trafficking conspiracy involving the transportation of women and girls from Mexico to the United States for the purpose of having the females work in prostitution. Jorge Estrada-Tepal Pre-Sentence Investigation Report ("J. Estrada-Tepal PSR") ¶¶ 3-13; Ricardo Estrada-Tepal Pre-Sentence Investigation Report ("R. Estrada-Tepal PSR") ¶¶ 5-15; Victor Leonel Estrada-Tepal Pre-Sentence Investigation Report ("V. Estrada-Tepal PSR") ¶¶ 3-13. The trafficking conduct underlying the offenses of conviction involved five victims, Jane Does #1 through #5. The defendants, who are brothers, utilized similar methods to cause these women and girls to work in prostitution, ranging from physical assaults, such as rape, beatings and threats of violence, to psychological coercion, including but not limited to false promises. As detailed in the PSRs and as set forth herein, each of the defendants personally played a role in this sex trafficking conspiracy.

A. <u>Jane Doe #1</u>

Had the case gone to trial, Jane Doe #1[1] would have testified, in sum and substance,[2] that she met defendant Jorge Estrada-Tepal ("Jorge") in Mexico, where they began dating and formed a serious relationship. Shortly thereafter, they had a marriage ceremony at her mother's house. Early in their marriage, Jorge forcibly engaged in sex with Jane Doe #1. After they were married, they moved to Puebla, Mexico, where Jorge forced Jane Doe #1 to work as a prostitute. Jorge gave Jane Doe #1 specific directions on how to work as a prostitute, including what she should wear and how much to charge. While she was in Mexico, Jane Doe #1 was required to work in a brothel, at a bar and in the streets. Jane Doe #1 often told Jorge that she did not want to work as a prostitute, to which Jorge responded that she needed to work in the prostitution business so that they could make money. After a period of time, Jorge told Jane Doe #1 that she was not making enough money working as a prostitute in Mexico, and suggested that they go to the United States so that they could make money to buy a home and to support her two children in Mexico. Jorge paid a fee to have Jane Doe #1 smuggled across the Mexico-United States border. After entering the United States, Jane Doe #1 initially lived with Jorge at an address in Queens, New York. Throughout their relationship, Jane Doe #1 felt that she was unable to refuse Jorge or leave because they were married, and Jane Doe #1 was raised in a Catholic cultural tradition that emphasized the importance of life-long marriage.

After her arrival in the United States in approximately 2008, Jorge pressured Jane Doe #1 to take a job at a bar, which she did. Jorge took all of the money Jane Doe #1 earned from that job each day. After several days of working at the bar, Jorge informed Jane Doe #1 that she would have to work as a prostitute. Jorge told Jane Doe #1 that drivers would transport her to the locations of various prostitution clients. After she began working, Jane Doe #1 generally saw at least 10 clients per shift, working seven days per week including when she had her period; Jorge required her to insert a household sponge during her menses so that she could continue work. Jane Doe #1 told Jorge a number of times that she did not want to work as a prostitute. Jorge reacted by becoming angry and verbally abusive. In addition, when Jane Doe #1 confronted Jorge about whether he had other women working for him as prostitutes, Jorge became physically abusive, and he struck her numerous

---

[1] Jane Doe #1 is identified as "Victim #2" in the criminal complaint and in the PSRs. The victims were renumbered in the indictment in chronological order based on when they were recruited/began work for the Estrada-Tepals.

[2] The summaries of the victims' expected testimony provided herein do not describe all of the relevant facts and circumstances of which they are aware; the summaries are included only to provide the Court and defendants with a general overview of the testimony the government would have elicited at trial.

2

times on the face. Fearing that Jorge would harm her or her family, Jane Doe #1 continued to work in prostitution for Jorge.[3]

Jane Doe #1 worked in prostitution for Jorge for approximately four years. During that period, Jorge threatened to harm Jane Doe #1's family if she did not continue to work. She was forced to work seven days a week, including during her menstrual cycle, seeing multiple prostitution clients each day. In addition, Jane Doe #1 was required to give Jorge all of the money she earned as a prostitute. Jorge physically assaulted Jane Doe #1, threatened her, punched walls and threw furniture when he was angry or drinking, which was frequent. Jane Doe #1 would have testified at trial that she continued to work as a prostitute because she was afraid of Jorge. She also would have testified that she became pregnant when she was working as a prostitute for Jorge and that he required her to take pills to induce an abortion even though she did not want to.

B. Jane Doe #2

Another victim, Jane Doe #2, has described, in substance and in part, how she met defendant Ricardo Estrada-Tepal ("Ricardo") in 2011 in Mexico, where they started dating. Shortly thereafter, she moved in with Ricardo at his residence in Puebla, Mexico. After Jane Doe #2 moved in with Ricardo, he sent her to work in prostitution, together with Jane Doe #5 and another female. At the time, Jane Doe #2 believed that she was in love with Ricardo, and was surprised and upset about what Ricardo was asking of her. However, due to her belief that they were in love and would have a future together, she engaged in some prostitution in Mexico, and provided her earnings to Ricardo.

Shortly thereafter, Ricardo suggested to Jane Doe #2 that they travel to the United States to work. Ricardo arranged for Jane Doe #2 to be smuggled across the Mexico-U.S. border by having smugglers hide Jane Doe #2 on a train. After she arrived in the United States, Jane Doe #2 traveled to New Jersey, where she was met by Ricardo's brother,[4] who has been identified as the defendant Victor Leonel Estrada-Tepal ("Victor"). Victor drove Jane Doe #2 to a residence in Queens, New York. Jane Doe #2 believes that she arrived at the residence on or about August 9, 2011. Shortly after arriving in New York, Victor pressured Jane Doe #2 to pay a debt owed for smuggling Jane Doe #2 into the United States. Jane Doe #2 contacted an uncle, who lived in Texas, and borrowed $1,000, and she also

---

[3] As set forth in the government's letter of November 15, 2014, the testimony at trial would also have shown that the defendants were involved with a number of additional females who were working in prostitution, some of whom were romantically involved with Jorge at the same time he represented himself to Jane Doe #1 as her husband. See Ex. F (Gov't Ltr. dated November 15, 2014, Docket No. 69 (filed under seal)).

[4] Jane Doe #2 would have testified that she had learned that Ricardo's group had been arrested when attempting to cross the Mexico-U.S. border, and that Ricardo had been returned to Mexico.

contacted a friend in Indiana from whom she borrowed another $1,000. Although Jane Doe #2 provided that money to the Estrada-Tepals, Victor told Jane Doe #2, in substance, that she would have to work as a prostitute to pay the smuggling debt. When Jane Doe #2 told Ricardo, by telephone, what Victor had told her, Ricardo told Jane Doe #2, in substance, to do what his brother told her to do. Ricardo also told her that she had to work and that if she did not, her family would pay the price. Ricardo also became very aggressive and often yelled at Jane Doe #2 and threatened to harm her family if she did not work. Feeling that she had no choice, Jane Doe #2 worked as a prostitute. A female named "Norma," who has been identified as Araceli Navarette-Castro, was living at the residence in Queens, and she advised Jane Doe #2 on how to work and how much to charge.

As set forth in the complaint,[5] on the first day Jane Doe #2 worked, she only had two clients because she was bleeding vaginally. Despite the medical problem, "Norma" and Victor told her that she would have to return to work the next day. By the third day, Jane Doe #2 did not see any customers because of her bleeding. She was then taken to the hospital and it was determined that she had an infection, making her unable to work for a week. After her recovery from the infection, she worked in prostitution with different drivers, who would drive her to meet prostitution clients. Jane Doe #2 initially gave the money she earned from prostitution to Victor. After a period of time, Ricardo instructed her to send him all of the money she earned, which Jane Doe #2 did, via wire transfer. During this time, Jane Doe #2 often spoke to Ricardo and told him that she did not want to work in prostitution, to which Ricardo responded that she had to work because he borrowed the money to smuggle her into the United States.

Ricardo later arrived in the United States, and by that time, Jane Doe #2 despised him for what he had done to her. Jane Doe #2 is expected to testify that Ricardo appeared to realize that something was wrong and attempted to convince her that everything was okay. When Jane Doe #2 resisted his sexual advances, he raped her. After Ricardo arrived in the United States, Jane Doe #2 gave him the money that she earned as a prostitute every night when she returned home.

In October 2011, Jane Doe #2 decided to run away. She left the Queens residence and escaped. Ricardo later called Jane Doe #2 and told her that if she did not return, something was going to happen to her or her family. Jane Doe #2 is also expected to testify that Jorge, Ricardo's brother, had a woman who worked for him as a prostitute (who has been located by HSI, and who is discussed above as "Jane Doe #1"). Jane Doe #2 understood that Jane Doe #1 sent the money that she earned in prostitution to Jorge in Mexico; after Jorge arrived in the United States, Jane Doe #1 gave the money that she earned directly to Jorge. In addition, Jane Doe #1 told Jane Doe #2, in substance, that Jorge beat her on two occasions because Jane Doe #1 did not want to work as a prostitute.

---

[5] In the complaint, Jane Doe #1 was identified as "Victim #2" and Jane Doe #2 was identified as "Victim #1."

C. <u>Jane Doe #3</u>

Another female, Jane Doe #3, was expected to testify at trial that she met Ricardo in Mexico approximately nine years ago. After they began a romantic relationship, Ricardo began pressuring her to work in prostitution. Jane Doe #3 advised him that she did not want to work in prostitution, but Ricardo told her that the only way for her to make money was for her to become a prostitute. Ricardo also stated that he wanted to be like his brothers and have money. Prior to working as a prostitute, Ricardo verbally abused and physically assaulted Jane Doe #3, including holding her down to yell at her, physically striking her, and hitting her in the face. Jane Doe #3 became fearful of Ricardo and, feeling that she had no choice, she began working in prostitution in Mexico. Jane Doe #3 was afraid that, if she refused to work, she would be abused further. Jane Doe #3 also felt that she could not return home to her family for social and cultural reasons, including because she had already been engaged in a sexual relationship with Ricardo, and her father had told Ricardo that he had to marry her.

While in Mexico, Ricardo gave Jane Doe #3 specific instructions of how she should engage in prostitution, including what she should wear and how much to charge. Ricardo required Jane Doe #3 to give him all of her prostitution earnings, and would physically take her purse when she came home so that he could remove all of the money. Ricardo informed Jane Doe #3 that they needed to go to the United States to make more money; Jane Doe #3 told Ricardo that she did not want to go because the trip to the United States was very dangerous. In or around May or June 2011,[6] Jane Doe #3 got pregnant; she gave birth to a son in March 2012, while Ricardo was in the United States. At the beginning of her pregnancy, Ricardo told Jane Doe #3 that he was going to the United States to work, and that he wanted Jane Doe #3 to join him in the United States after the birth of their child. After the birth of her son, Ricardo repeatedly requested and threatened Jane Doe #3 to convince her to come to the United States. Specifically, Ricardo threatened that if she did not come to the United States, Ricardo was going to take their son so that she could never see him again. Jane Doe #3 discussed with Ricardo what type of work she would be doing when she came to the United States, and she told Ricardo that she would only work in a restaurant, and did not want to work as a prostitute. Ricardo assured Jane Doe #3 that she would be able to work in a restaurant.

Jane Doe #3 was smuggled into the United States in April 2013 (leaving her son in Mexico with her parents), and ultimately began residing with Ricardo in Queens. A couple of months after arriving in the United States, Ricardo informed Jane Doe #3 that she needed to start working as a prostitute. When Jane Doe #3 told Ricardo that she did not

---

[6] As set forth above, Ricardo initiated a romance with Jane Doe #2 and ultimately pressured her into prostitution close in time to when Jane Doe #3 became pregnant and temporarily ceased working in prostitution.

5

come to the United States to work as a prostitute, Ricardo became very upset and threatened to hit her. Jane Doe #3 gave in to Ricardo's demands and began working in the United States as a prostitute. Ricardo gave Jane Doe #3 instructions about how to work as a prostitute in the United States, including that she would be transported to prostitution clients by drivers. She also saw some prostitution clients at apartments, including the clients' apartments and the apartment occupied by Jane Doe #4 and V. Estrada-Tepal. Jane Doe #3 saw approximately 15-20 clients per shift, working seven days per week except when she had her period; the rate was approximately $40 per client. Ricardo told her what to wear and how much to charge. After each of her prostitution shifts, Ricardo demanded to know how much money Jane Doe #3 had made and how many clients she saw; he would then take all of the money from her. On numerous occasions, Jane Doe #3 was in pain and tired from her previous prostitution shift, and told Ricardo she did not want to go to work. This led to physical and verbal altercations, during which Ricardo would pull her hair, slap her and kick her. To end the abuse, Jane Doe #3 would return to work. On one occasion, Jane Doe #3 made Ricardo believe she was going to work, but instead, she walked around on the street crying. Ricardo contacted her over the telephone, during which conversation Jane Doe #3 told Ricardo that she did not want to work as a prostitute anymore. Ricardo responded that if Jane Doe #3 did not work as a prostitute, he was going to travel back to Mexico and take her child away from her. Jane Doe #3 never went to the hospital or the police because she was too scared of what would happen to her afterwards if Ricardo found out.

    D. Jane Doe #4

As set forth in the second superseding indictment, Jane Doe #4 (who has been identified in court as defendant Araceli Navarrete-Castro) was trafficked in or about and between April 2009 and February 7, 2010, when she turned 18 years old. She was brought to the United States primarily by defendant Victor Estrada-Tepal, who was her husband. After her arrival in the United States, Jane Doe #4 worked as a prostitute and also provided information as to how to work to other female victims of the Estrada-Tepal brothers.

    E. Jane Doe #5

Jane Doe #5 was recruited in Mexico to work in prostitution by the defendants' brother, Juan Carlos Estrada-Tepal, with whom Jane Doe #5 became involved romantically in approximately 2009, when Jane Doe #5 was 19 and Juan Carlos was in his 30s. At that point, Jane Doe #5 was working in a bar in Oaxaca drinking and dancing with clients, but was not engaged in prostitution. A few months after meeting Juan Carlos, Jane Doe #5 became pregnant with his child, and their relationship began to change. Juan Carlos became increasingly violent, including an incident where he nearly suffocated Jane Doe #5 with a blanket when she was approximately six months pregnant. She also learned that others in the Estrada-Tepal family were involved in prostitution, including Jane Doe #3.

After the birth of her child, Jane Doe #5 resumed working in the bar in Oaxaca for a period of time, and her relationship with Juan Carlos remained volatile and, at times

6

turned violent.  Thereafter, Juan Carlos made arrangements for their child to live with his family in another city, and Juan Carlos and Jane Doe #5 contemplated coming to the United States; Juan Carlos told her that his brothers would help them with making plans to cross the border.  They attempted to enter the United States two times, but were caught by border patrol and returned to Mexico.  During this period of time, Juan Carlos told Jane Doe #5 that she was to start working in prostitution, telling her that his brothers' women worked as prostitutes and they made more money than she did.  Although Jane Doe #5 did not want to work in prostitution, she felt that she had no choice.  Jane Doe #5 then worked for a period of time in prostitution in Mexico prior to coming to the United States with Jane Doe #2 in the summer of 2011.  Juan Carlos, Jorge and Victor made the arrangements for Jane Doe #5 to come to the United States in 2011.

As set forth in the attached victim-impact statement submitted by Jane Doe #5,[7] after her arrival in the United States, she worked in prostitution in the United States for approximately two years.  During that time, when she was working, she saw approximately 15-20 clients per day at a rate of approximately $35 per client, seven days per week.  Shortly after her arrival in the United States, however, Jane Doe #5 learned she was pregnant.  Jorge and Victor became upset when they learned Jane Doe #5 was pregnant and the Estrada-Tepal brothers provided Jane Doe #5 with pills to induce an abortion.  Afterwards, V. Estrada-Tepal asked her if she took all the pills, and pressured her for money.  Jane Doe #5 refused to take all the pills and gave birth to a daughter in April 2012.  Notwithstanding her condition, Jane Doe #5 was required to work in prostitution until she was approximately four months pregnant.  In addition, due to the pressures being placed on her, approximately two months after her daughter was born, she resumed working in prostitution, and was thereafter instructed to send her daughter to Mexico to live with Juan Carlos; her daughter was taken to Mexico in January 2013.  Although Jane Doe #5 did not want to send her daughter to Mexico, she feared that refusing to do so could cause her to never see her son, who was living with Juan Carlos in Mexico, ever again.  Thereafter, Juan Carlos told Jane Doe #5 that she would not be able to see either of her children if she did not continue working and sending him money.

While working in the United States, as set forth in her victim-impact statement, Jane Doe #5 was under the watchful eye of the Estrada-Tepal brothers:

> I was constantly pressured and threatened to make more money.  They also took money from me in order to bring more women to the United States.  I was told that if I didn't earn enough, I would never see my children again.  This is what forced me to continue working even though I never wanted to.  Throughout the time I was trafficked by the

---

[7] The government notes that undersigned counsel amended the attached victim-impact statement so as to add the correct Jane Doe number and redact a portion of Jane Doe #5's signature so as to protect her privacy.

7

> Estrada-Tepal brothers, I was constantly depressed and frightened. I was frightened for myself and for my children. I was always under the watch of the Estrada-Tepal brothers so that I wouldn't make any "mistakes" and they reported everything I did to Juan Carlos back in Mexico, who had my children.

Jane Doe #5 Victim-Impact Statement (attached as Ex. D).

F. Documentary Evidence

In addition to the testimony of the Jane Does, had the case gone to trial, the government would have presented, inter alia, medical records related to Jane Doe #2, telephone records and wire transfer records that both corroborated the victims' expected testimony and demonstrated that the defendants were transferring substantial sums of money to Mexico via wire transfer.

For example, as set forth in the criminal complaint,[8] wire transfer records show that an individual using the name Victor Leonel Estrada-Tepal sent approximately 154 wire transfers totaling approximately $70,287 between June 9, 2009 and February 20, 2013, via Ria to various individuals in Mexico, including but not limited to Ricardo Estrada-Tepal and Jorge Estrada-Tepal. An individual using the names Victor Leonel Estrada-Tepal and Victor Estrada-Tepal also sent approximately 350 wire transfers totaling approximately $80,146 between August 31, 2009 and January 5, 2014, via Western Union to various individuals in Mexico, including but not limited to Ricardo Estrada-Tepal, Jorge Estrada-Tepal and an unindicted co-conspirator ("CC#1") in Mexico. In addition, an individual using the name Victor Leonel Estrada-Tepal sent approximately 41 wire transfers totaling approximately $10,551 between May 25, 2009 and October 13, 2013, via Casa de Cambio to various individuals in Mexico, including but not limited to Ricardo Estrada-Tepal and CC#1. Moreover, an individual using the name Jorge Estrada-Tepal sent approximately 117 wire transfers totaling approximately $18,161 between January 14, 2008 and October 28, 2011 via Casa de Cambio to various individuals in Mexico. In addition, an individual using the name "Ricardo Estrada" and 646-427-6119 as his contact telephone number sent approximately 251 wire transactions sent via Western Union, totaling approximately $28,544, to individuals in Mexico, between October 3, 2011 and November 11, 2013.

---

[8] In discovery, the government disclosed wire transfer records from a number of wire remitting companies, including Casa de Cambio, Dolex, Intermex, La Nacional, Mateo, Omnex, Ria, Sigue, Transfast and Western Union. See Discovery Letter, dated May 19, 2014 (Docket Entry No. 27). At trial, the government would have called a witness to testify regarding these voluminous records and to introduce summary charts of the wire transfers, pursuant to Federal Rule of Evidence 1006. The Complaint in this case included specific analyses of these wire transfer records, but did not include a comprehensive analysis of all of the records from the various companies.

8

In addition, the government would have presented translated text messages from the defendants' cellular telephones that demonstrated their knowledge of the work being done by the Jane Does (for example, a multitude of messages between Jane Doe #4 and V. Estrada-Tepal regarding scheduling of client appointments); and the defendants' involvement in making arrangements to smuggle Jane Doe #3 across the border in 2013.

At trial, the government would also have presented physical items, including condoms that were provided by victims to the government as evidence, and notebooks maintained by Jane Doe #5 that documented her payments to the brothers for her passage, and documenting when she was provided with pills in an effort to induce an abortion of her daughter, as well as pills that were provided by Juan Carlos on a second occasion, which Jane Doe #5 took to terminate another pregnancy in 2013, as a result of Juan Carlos's telling her that she could "forget about her children" if she refused to terminate the pregnancy.

Other physical evidence at trial would have included items that were recovered during the consent searches of the defendants' residences, including quantities of condoms, telephones, notebooks and dozens of different cards featuring photographs of scantily-clad women and telephone numbers, which are often referred to as "chica cards." Through witness testimony, including victim-witness testimony, the government would have established that "chica cards" are used by prostitution drivers to gain clients, and that the victims used the "chica cards" to contact prostitution drivers to arrange for work.

Finally, the government would have offered statements made by each defendant at the time of, and subsequent to, their administrative arrests, in which they acknowledged, in substance and in part, that they were not legally residing in the United States and how they had been involved in the smuggling of themselves and others into the United States. In addition, Ricardo Estrada-Tepal admitted that his wife, Jane Doe #3, had worked in prostitution. See J. Estrada-Tepal PSR ¶¶ 18-21 (detailing arrest of Jorge); R. Estrada-Tepal PSR ¶¶ 18-19 (detailing arrest of Ricardo); V. Estrada-Tepal PSR ¶¶ 14-15 (detailing arrest of Victor).

II.     The Defendants' Guilty Pleas

During the week of January 12, 2015, all three defendants pled guilty to sex trafficking charges related to their involvement in this conspiracy. Specifically, the defendants pled guilty to the following counts:

| **Defendant** | **Charges** | **Victims** |
|---|---|---|
| Jorge Estrada-Tepal | - Conspiracy to commit sex trafficking in or about and between 2007 and January 2014 (Count One)<br><br>- Sex trafficking of Jane Doe #1, in or about and between 2007 and 2011, in violation of 18 U.S.C. § 1591(a)(1), (a)(2) & 1591(b)(1) (Count Two) | Jane Doe #1 |
| Ricardo Estrada-Tepal | - Conspiracy to commit sex trafficking in or about and between 2007 and January 2014 (Count One)<br><br>- Sex trafficking of Jane Doe #3, in or about and between April 2013 and January 2014, in violation of 18 U.S.C. § 1591(a)(1), (a)(2) & 1591(b)(1) (Count Four) | Jane Doe #3 |
| Victor Estrada-Tepal | - Conspiracy to commit sex trafficking in or about and between 2007 and January 2014 (Count One)<br><br>- Sex trafficking of a minor, Jane Doe #4, in or about and between April 2009 and February 7, 2010, in violation of 18 U.S.C. § 1591(a)(1), (a)(2) & 1591(b)(2) (Count Five) | Jane Doe #4 |

The government's guidelines estimates for each of the defendants are detailed in their respective plea agreements, which are attached hereto as Exhibits A through C. Specifically, for Jorge Estrada-Tepal, the government estimated the Adjusted Offense Level as level 39. Reducing that level by two points for acceptance of responsibility, the offense level estimated in the plea agreement was level 37, with a guidelines imprisonment range of 210 to 262 months. J. Estrada-Tepal Plea Agmt. at p. 3-5.

For defendant Ricardo Estrada-Tepal, the government estimated the applicable offense level as level 35. Subtracting two levels for acceptance of responsibility, the offense level estimated in the plea agreement was level 33, with a guidelines imprisonment range of 135 to 168 months. However, due to the operation of the 15-year statutory mandatory minimum, Ricardo Estrada-Tepal is subject to a mandatory minimum sentence of 180 months. R. Estrada-Tepal Plea Agmt. at p. 3-4.

For defendant Victor Estrada-Tepal, the government estimated the applicable offense level as level 37. Subtracting two levels for acceptance of responsibility, the adjusted offense level estimated in the plea agreement was level 35, with a guidelines imprisonment range of 168-210 months. V. Estrada-Tepal Plea Agmt. at p. 3-5.

III. Applicable Guidelines

The Guidelines calculations in the PSRs differ from those in the plea agreements in certain limited respects.

A. Jorge Estrada-Tepal

There are two differences between the government's guidelines estimate and the PSR's guidelines estimate for defendant Jorge Estrada-Tepal. In his PSR, the Probation Department included all five Jane Does in the multiple count analysis (J. Estrada-Tepal PSR ¶ 53), resulting in an adjusted total offense level of 40, rather than 39, as estimated in the plea agreement. The government did not include Jane Doe #3 in its estimate of Jorge's applicable guidelines as Jane Doe #3 was principally trafficked by Ricardo, and the government did not anticipate being able to prove that Jorge played a role in Jane Doe #3's trafficking by a preponderance of the evidence.

Second, the Probation Department indicated that the government intends to move for a third level for acceptance of responsibility. (J. Estrada-Tepal PSR ¶ 59). Given the defendants' plea very close to trial, the government will not move for the third point under U.S.S.G. § 3E1.1(b). However, the government did estimate a one-level global reduction in the event that all three defendants pled guilty. See J. Estrada-Tepal Plea Agmt. ¶ 7.

For these reasons, the government respectfully submits that the appropriate Guidelines are those estimated by the government in the plea agreement.

B. Ricardo Estrada-Tepal

As to Ricardo Estrada-Tepal, there are three differences between the government's estimate in the plea agreement and the Probation Department's guidelines estimate, which resulted in an adjusted total offense level of 37, rather than 33, as estimated in the plea agreement. First, the Probation Department applied a vulnerable victim enhancement as to Ricardo Estrada-Tepal, which the government had not included in its estimate. See R. Estrada-Tepal PSR ¶ 56. For the reasons discussed below, the government did not anticipate having sufficient evidence to prove Ricardo's knowledge of any unusual vulnerabilities as to Jane Does #1, #4 and #5. Rather, Ricardo was principally responsible for trafficking Jane Doe #2 and Jane Doe #3.

The commentary to Section 3A1.1 provides that the vulnerable victim enhancement should be applied when the victim is a victim of the offense of conviction, "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, Application Note 2.

11

Further, the enhancement applies when "the defendant knows or should have known of the victim's unusual vulnerability." Id. In this case, the government has limited evidence of Ricardo's interactions with Jane Does #1, #4 and #5 and thus did not anticipate being able to establish his knowledge of any of their vulnerabilities. As to Jane Does #2 and #3, the government does not have specific evidence of their vulnerability other than their ages and backgrounds. Accordingly, although the Probation Department's application of the enhancement is a reasonable interpretation of § 3A1.1, the government did not anticipate seeking to establish Jane Does #2 or #3 as vulnerable victims at sentencing and does not now seek this enhancement in light of the fact that it was not contemplated at the time of the defendants' guilty pleas.

Jane Doe #1 is exceptionally vulnerable in that she has an extremely low educational level, having completed only the second grade in Mexico, after having been held back in second grade until she was in her teenage years. Her educational background suggests that she may have some cognitive impairment; she also has communication difficulties. Accordingly, the vulnerable victim enhancement would apply in Jorge Estrada-Tepal's guidelines calculation as he knew her well, and was aware of her limited abilities. In contrast, although Jane Doe #2 and #3 are from impoverished parts of Mexico and were taken advantage of by Ricardo and the Estrada-Tepal family, the government did not anticipate a vulnerable victim enhancement as to them, and does not seek it now.

Second, the Probation Department included all five Jane Does in the multiple count analysis (R. Estrada-Tepal PSR ¶ 60). In contrast, the government only included two victims in its analysis, Jane Does #2 and #3. As to Jane Doe #1, she was principally trafficked to the United States by Ricardo's older brother Jorge, a few years prior to Ricardo's involvement in trafficking in this country. Accordingly, the government did not anticipate being able to prove that Ricardo played a role in Jane Doe #1's trafficking by a preponderance of the evidence. Similarly, the government does not have any evidence of Ricardo's specific involvement in trafficking Jane Doe #4 when she was a minor. Likewise, the government does not anticipate being able to prove Ricardo's knowledge of any force, fraud and coercion vis-à-vis Jane Doe #5, who was principally trafficked by Juan Carlos Estrada-Tepal, and as to whom threats were made in the United States by Jorge and Victor.

Third, the Probation Department indicated that the government intends to move for a third level for acceptance of responsibility. (R. Estrada-Tepal PSR ¶ 66). Given the defendants' plea very close to trial, the government will not move for that third point. However, the government did estimate a one-level global reduction in the event that all three defendants pled guilty. See R. Estrada-Tepal Plea Agmt. ¶ 7.

C. Victor Estrada-Tepal

As to Victor Estrada-Tepal, there are also three differences between the government's estimate in the plea agreement and the Probation Department's guidelines estimate, which result in an adjusted total offense level of 37, rather than 35, as estimated in the plea agreement. First, the Probation Department applied a vulnerable victim enhancement as to Victor Estrada-Tepal, which the government had not included in its

12

estimate. See V. Estrada-Tepal PSR ¶ 49. For the reasons discussed below, the government did not anticipate having sufficient evidence to prove Victor's knowledge of any unusual vulnerabilities as to the victims.

Here, the government has limited evidence of Victor's interactions with Jane Does #1, #2 and #3, and thus did not anticipate being able to establish his specific knowledge of their vulnerabilities. More specifically, all three of these Jane Does were recruited by Victor's brothers Jorge and Ricardo and the government cannot show that Victor had knowledge of their backgrounds or other relevant information that would establish knowledge of unique vulnerability. As to Jane Does #4 and #5, with whom Victor had more interaction, the government does not have specific evidence of their vulnerability other than their ages and backgrounds. Accordingly, although the Probation Department's application of the enhancement is a reasonable interpretation of § 3A1.1, the government did not anticipate establishing these victims as vulnerable at sentencing by a preponderance and does not seek this enhancement as to Victor.

Second, the Probation Department included all five Jane Does in the multiple count analysis (V. Estrada-Tepal PSR ¶ 53). In contrast, the government only included four victims in its analysis, Jane Does #1, #2, #4 and #5. As to Jane Doe #3, she was principally recruited and trafficked to the United States by Ricardo, and the government has limited evidence of Victor's interactions with Jane Doe #3. Accordingly, the government did not anticipate being able to prove Victor's role in trafficking Jane Doe #3 by a preponderance of the evidence.

Third, the Probation Department indicated that the government intends to move for a third level for acceptance of responsibility. (V. Estrada-Tepal PSR ¶ 59). Given the defendants' plea very close to trial, the government will not move for that third point. However, the government did estimate a one-level global reduction in the event that all three defendants pled guilty. See V. Estrada-Tepal Plea Agmt. ¶ 7.

IV.     Analysis

In the Supreme Court's opinion in United States v. Booker, 543 U.S. 220 (2005), which held that the Sentencing Guidelines are advisory not mandatory, the Supreme Court made clear that district courts are still required to consider Guidelines ranges in determining sentence, but also may tailor the sentence in light of other statutory concerns. See 18 U.S.C. § 3553(a).

Thereafter, in Gall v. United States, 552 U.S. 38 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 552 U.S. at 49 (citation omitted). Next, a sentencing court should "consider all of the 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an

13

individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

In their submissions, each of the defendants seeks the statutory mandatory minimum sentence applicable to their case. For Jorge and Ricardo, they each seek a 15-year sentence; Victor seeks ten years. For the reasons that follow, the government respectfully submits that the defendants should be sentenced at the high end of the guidelines ranges estimated in their respective plea agreements.

A. Jorge Estrada-Tepal

Defendant Jorge Estrada-Tepal seeks a sentence of 15 years, the mandatory minimum sentence applicable as a result of his plea to Count Two. J. Estrada-Tepal Ltr. at 1 (Docket No. 122). In support of his argument, Jorge contends that a 15 year sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. In his submission, Jorge describes his childhood and family background, id. at 3-5; the context of the offense conduct, id. at 5-7; his health status, including his substance abuse problems, id. at 7-8; and his lack of prior criminal history, id. at 8. He further argues that a 15-year sentence is sufficient under 18 U.S.C. § 3553(a) due to (1) the length of his pre-trial confinement at the MDC, id. at 11; (2) post-arrest conduct, id. at 12; (3) family circumstances, id. at 12-13; and (4) the context of his offense conduct, id. at 13.

None of these grounds warrants a deviation from the applicable guidelines. First, Jorge has been in pre-trial detention only since January 2014. Moreover, to the extent that he was in pre-trial detention longer than necessary, the government submits that was due in part to his own repeated requests for new counsel and consequent delays of scheduled hearing and trial dates. In short, he and his co-defendants substantially contributed to the length of their stay in pre-trial detention. More importantly, however, his argument misses the mark on the merits: his 19-month stay in pre-trial detention was not unduly long as an objective matter, and he has not demonstrated any facts to establish that his pre-trial confinement was unduly harsh. Similarly, other than cursory claims that he has demonstrated remorse to counsel, Jorge has not demonstrated any extraordinary post-offense rehabilitation that would warrant departure.

As for family circumstances, Section 5H1.6 of the Guidelines instructs sentencing courts that family circumstances are not ordinarily relevant in determining the appropriate sentence. U.S.S.G. § 5H1.6. Indeed, it has long been the practice in the Second Circuit to grant a substantial departure on this basis only where the family circumstances at issue are "extraordinary." See United States v. Galante, 111 F.3d 1029, 1033-34 (2d Cir. 1997). The ordinary hardship imposed on a defendant's family from his imprisonment does not generally warrant a downward departure. See id.; United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."). Rather, a downward departure is only justified where family members are "uniquely dependent" upon a defendant for financial or emotional support. United States v. Faria, 161 F.3d 761, 762 (2d Cir. 1998). Applying this standard, the defendant's family circumstances

14

do not warrant a sentence below the advisory range. As the defendant himself acknowledges, he has never even met the child whom he claims needs his financial support. Although his incarceration may have impacted the child's financial circumstances to some degree, because the defendant has not demonstrated that his wife and children are "uniquely dependent," Faria, 161 F.3d at 762, upon him for support, he has failed to establish the appropriateness of a downward departure or non-guidelines sentence on this basis.

Defendant Jorge Estrada-Tepal further argues for leniency based on the "context" of his criminal conduct, arguing that prostitution is rampant in Mexico, and that Jane Doe #1 and other victims in this case worked in prostitution in Mexico, id. at 13. Although it is true that Jane Doe #1 worked in prostitution in Mexico, defendant Jorge Estrada-Tepal entirely fails to note that her work as a prostitute in Mexico was done at his direction. Moreover, he has not acknowledged or taken responsibility for using force, threats or coercion that caused her to engage in prostitution in Mexico, which started shortly after their marriage. Rather, throughout the sentencing submission, Jorge seems to imply that Jane Doe #1 willingly worked as a prostitute in Mexico the entire time she so worked, and does not acknowledge his own role in recruiting her and teaching her how to work. He also does not appear to admit or acknowledge his violence towards her in Mexico. As set forth above, Jane Doe #1 was a vulnerable victim. Even less educated and capable than the defendants, she fell under Jorge's influence after being wooed into marriage in the Catholic tradition. As a very uneducated, poor rural Catholic herself, Jane Doe #1 felt that she had no choice but to obey her husband and put up with mental, verbal and physical abuse, which she endured for years. Isolated into a life of prostitution by the defendant, and cut off from her family, Jane Doe #1 suffered for years before finally meeting someone in the United States whom she felt she could trust.

In addition, after bringing Jane Doe #1 here, the defendant then proceeded to support his brothers in their efforts to bring additional females to the United States to work in prostitution. The defendant thus contributed to the victimization of additional women and Jane Doe #4, who was a minor at the time. Accordingly, rather than constituting a mitigating circumstances, the context of the defendant's offense warrants a severe sentence.

Nothing about Jorge's background or personal circumstances warrants leniency in the face of the extremely serious criminal conduct in which he engaged, and as to which he has admitted his responsibility. With regard to his impoverished background, for example, Jorge is similarly situated to all defendants who engage in criminal activity, in part due of financial necessity. See, e.g., United States v. Vera Ramos, 296 Fed. App'x 201, 203-04 (2d Cir. Oct. 21, 2008) (affirming Guidelines sentence despite defendant's "'difficult upbringing' and 'very substantial family responsibilities'" and noting district court's observation that such circumstances are "almost universal" among defendants in similar cases). Moreover, Jorge's involvement in trafficking four victims from Mexico to the United States with the intent to force them into prostitution and his use of violence merit a sentence that reflects the seriousness of the offense and deters criminal conduct. See 18 U.S.C. § 3553(a). The government thus respectfully submits that the Court should sentence

defendant Jorge Estrada-Tepal to the high end of the 210-262 month Guidelines range estimated in the plea agreement. See J. Estrada-Tepal Plea Agmt. at 5.

B. Ricardo Estrada-Tepal

Defendant Ricardo Estrada-Tepal seeks a statutory mandatory minimum sentence of 15 years, which sentence exceeds the guidelines range estimated in the plea agreement. In support of his argument, Ricardo Estrada-Tepal argues that his impoverished, uneducated background militates in favor of leniency. Ricardo also argues that he was "essentially involved with only one woman, who he considered his wife and with whom he has a child." R. Estrada Tepal Ltr. at 5 (Docket No. 123). In context, this is a clear reference to Jane Doe #3.

While the government does not advocate for an upward departure for Ricardo pursuant to the terms of his plea agreement, it is not accurate that his conduct only involved one woman. Rather, as set forth above, Ricardo personally recruited two separate women to work in prostitution, claiming that he was in love with Jane Doe #2 after Jane Doe #3 became pregnant in 2011, which meant she could not work in prostitution or travel to the United States with Ricardo that year. This fraudulent conduct, which was simultaneously directed at two women, together with the threats of violence and actual violence that he used against them, belies the claim that Ricardo was simply an impressionable person who was following his brothers' lead.

As set forth in the PSR and discussed herein, the crime of conviction is extremely serious, and the Court should fashion a sufficiently severe sentence so as to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

C. Victor Estrada-Tepal

Defendant Victor Estrada-Tepal first challenges the application of the vulnerable victim enhancement. V. Estrada-Tepal Ltr. at 2 (Docket No. 124). As set forth above, the government did not include this enhancement in its estimate for the reasons set forth above,[9] and does not seek to prove facts to support its application at sentencing.

Victor also seeks a sentence below the applicable guidelines range, advocating for a sentence of ten years, the mandatory minimum applicable as a result of his guilty plea

---

[9] The government soundly objects, however, to defendant Victor Estrada-Tepal's argument that the victims in this case were not vulnerable due to prior or subsequent involvement in prostitution. The statement that "several of the 'victims' were experienced prostitutes or continued prostitution after they left the defendants," id. at 2, is factually inaccurate and inapposite. Had the case gone to trial, Jane Does #1, #2, #3 and #5 were all expected to testify that they had not engaged in prostitution prior to becoming involved with the Estrada-Tepal brothers in Mexico. In addition, subsequent involvement in prostitution is totally irrelevant to the question of vulnerability. See generally Fed. R. Evid. 412.

16

to Count Five. In support of his argument, Victor submits that a below-guidelines sentence is appropriate due to (1) his and his brothers' difficult childhood in Mexico; (2) post-arrest rehabilitation, claiming that "Victor has been compliant with prison regulations," id. at 5; and (3) the defendant's remorse and acceptance of responsibility.

None of these factors warrants a substantial deviation from the guidelines range anticipated in the parties' plea agreement, namely 168-210 months. First, although the defendant's background may be sympathetic, he is no differently situated from other defendants who engage in crime out of economic necessity or due to a difficult upbringing. Moreover, similarly to Jorge, Victor has not adduced any evidence to support leniency due to extraordinary post-offense rehabilitation or acceptance of responsibility.

As set forth above, Victor was an active participant in the use of force and threats to cause Jane Does #2 and #5 to work in prostitution after their arrival in the United States in 2011, and he personally recruited Jane Doe #4 to work in prostitution as a minor. Given his role in these offenses, which involved the sexual exploitation of three females, and caused lasting, damaging physical and psychological effects, the Court should sentence the defendant to the high end of the estimated guidelines range.

V.    Conclusion

Although the defendants' personal circumstances may of course be considered under the sentencing factors enumerated at 18 U.S.C. § 3553(a), a balancing of those factors weighs in favor of imposing sentences in this case at the high end of the Guidelines ranges estimated in the defendants' plea agreements. First, the history and circumstances of the offenses of conviction are extremely serious, and involved a coordinated scheme over many years to flout the immigration laws and earn money from forcibly requiring women and a girl to engage in highly dangerous, degrading prostitution work. Second, the defendants' regular use of force, threats of force, fraud and coercion to cause the Jane Does to work warrants substantial punishment.

17

Under these circumstances, a sentence of incarceration at the high end of the advisory Guidelines range is appropriate in order to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Indeed, a substantially below-Guidelines sentence in a case such as this could well promote disrespect for the law. See, e.g., United States v. Cutler, 520 F.3d 136, 154 (2d Cir. 2008) (concluding that the district court made errors in certain "Guidelines applications and in its departure decisions; that the sentences imposed did not properly interpret certain of the sentencing factors that the court was required to consider under 18 U.S.C. § 3553(a), such as just 'punishment' and deterrence of others; and that some of the court's rationales would promote disrespect for the law").

    Respectfully submitted,

    KELLY T. CURRIE
    Acting United States Attorney

By:   /s/ Taryn A. Merkl
    Taryn A. Merkl
    Melody Wells
    Assistant U.S. Attorneys
    (718) 254-6064/6422

cc:   Clerk of Court (MKB)
    All counsel (by ECF)
    U.S. Probation Officers John J. Lanigan & Patricia Sullivan